Curt C. Hartman, Judge Hamilton County Common Pleas Court
Following receipt of testimonial and documentary evidence over the course of several days, this matter is now before the Court on the Motions for Preliminary Injunction filed by Plaintiff LAMAR ADVANTAGE GP CO., LLC, dba LAMAR ADVERTISING OF CINCINNATI, OH, and Plaintiff NORTON OUTDOOR ADVERTISING, INC., wherein both parties seek the issuance of a preliminary injunction so as to restrain Defendants CITY OF CINCINNATI and its officials from implementing or enforcing: (i) Chapter 313 of the Cincinnati Municipal Code as recently enacted through Ordinance No. 167-2018 which imposed an Outdoor Advertising Sign Excise Tax on all outdoor advertising signs, i.e. , a billboard tax, throughout the City of Cincinnati; and (ii) certain provisions of Chapter 895 of the Cincinnati Municipal Code as recently amended through Ordinance No. 163-2018 whereby, inter alia , certain fees associated with permits concerning billboards were increased and the renewal period for such permits was changed from a biennial requirement to an annual requirement.
Because: (i) the newly-enacted billboard tax directly and unequivocally isolates and targets for taxation a small group that owns and controls the means or instruments used exclusively for the exercise of First Amendment rights; and (ii) the tax constitutes a discriminatory tax upon those means or instruments, the billboard tax clearly violates the First Amendment consistent with Grosjean v. American Press Co. , 297 U.S. 233, 56 S.Ct. 444, 80 L.Ed. 660 (1936), Minneapolis Star & Tribune Co. v. Minnesota Comm'r of Revenue , 460 U.S. 575, 103 S.Ct. 1365, 75 L.Ed.2d 295 (1983), and Leathers v. Medlock , 499 U.S. 439, 111 S.Ct. 1438, 113 L.Ed.2d 494 (1991). Furthermore, because the billboard tax is the sine qua non for the entirety of Chapter 313 of the Cincinnati Municipal Code, as well as in light of another provision of Chapter 313 also violating the First Amendment, severing the billboard tax would not be consistent with nor advance the clear intention of the Cincinnati City Council through its adoption of Ordinance No. 167. Accordingly, a preliminary injunction *810 against implementation or enforcement of any provision of Chapter 313 is warranted.
With respect to the recently-amended provisions of Chapter 895 of the Cincinnati Municipal Code, because, following commencement of this action, the Cincinnati City Council passed Ordinance No. 323-2018 whereby it effectively reinstated the status quo ante passage of Ordinance No. 163 as it related to both the fees associated with billboard permits and the renewal period for such permits as contained in Chapter 895 of the Cincinnati Municipal Code, the claim for preliminary injunctive relief with respect to Chapter 895 as amended by Ordinance No. 163 has become moot.
I.
A.
On June 27, 2018, the Cincinnati City Council passed, as an emergency measure, Ordinance No. 167-2018. Ordinance No. 167 enacted, inter alia , a new Chapter 313 to the Cincinnati Municipal Code through which the CITY OF CINCINNATI "levied an excise tax on the privilege of installing, placing, and maintaining" outdoor advertising signs, i.e. , billboards, in the City of Cincinnati. Cincinnati Municipal Code § 313-3(a) . The amount of the billboard tax is the greater of: (i) seven percent of the gross receipts generated by or attributable to any billboard located in the City of Cincinnati; or (ii) an annual minimum tax which varies based upon the type of billboard (electronic versus non-electronic) and the location of the billboard (in close proximity to an interstate or primary highway versus all other locations).[1] Cincinnati Municipal Code § 313-3(b) .
Generally speaking, the billboard tax is imposed against all signs in the City of Cincinnati greater than 36 square feet in total face area, regardless of whether the sign is advocating a commercial message vel non and whether any commercial message is directed to the premises where the sign is located vel non. See Cincinnati Municipal Code § 313-5(a)(iii); Cincinnati Municipal Code § 313-1-O . The only other exceptions to the imposition of the billboard tax are for: (i) signs "owned, controlled, leased, licensed, or otherwise used by the United States, the State of Ohio, or the city of Cincinnati"; and (ii) signs otherwise declared exempt from regulation pursuant to Cincinnati Municipal Code § 895-2 and Cincinnati Municipal Code § 1427-07.[2] Cincinnati Municipal Code § 313-5(a)(i) & 313-5(a)(ii) .
All persons owning or controlling any billboard within the City of Cincinnati are required to register all billboards subject to the billboard tax. Cincinnati Municipal Code § 313-9 .[3] And those persons are also *811 mandated to file quarterly and annual tax returns, with the latter requiring disclosure of the gross receipts for each billboard. Cincinnati Municipal Code § 313-11(b) & 313-11(c) . Furthermore, without the issuance of a warrant or the opportunity for pre-compliance review before a neutral decision maker, those subject to the billboard tax (or even suspected of being subject to it) are mandated to afford the city treasurer or his designee "access to all records and evidence at all reasonable times" as well as to provide them "the means, facilities and opportunity to conduct any examination or investigation upon reasonable notice". Cincinnati Municipal Code § 313-11(e)(i) & 313-11(e)(i) .
While the owners of billboards may pass the cost of the billboard tax onto an advertiser who leases a billboard, Cincinnati Municipal Code § 313-7(c)(i) , the owners may not, by express prohibition, "state in any manner, whether directly or indirectly, that the tax or any part thereof will be assumed or absorbed by an advertiser, or that it will be added to the rent or other charge." Cincinnati Municipal Code § 313-7(b) . Also, the billboard tax may not "be stated or charged separately from the rent or other consideration paid by an advertiser...or shown separately on any record thereof, or otherwise reflected upon any bill, statement or charge made for the sign's use...." Cincinnati Municipal Code § 313-7(a) .
In passing Ordinance No. 167 as an emergency ordinance, the Cincinnati City Council invoked the talismanic language that it was "necessary for the preservation of the public peace, healthy [sic], safety, and general welfare." Ordinance No. 167-2018, sec. 7 . Specifically, the City Council indicated the immediate implementation of the billboard tax was necessary so that city officials and departments could establish the necessary regulations and procedures, put in place the appropriate staffing, and reach out to owners of billboards so that the City could begin to collect the tax no later than October 15, 2018, when the first quarterly tax returns and associated payments would be due. Ordinance No. 167-2018, sec. 5 & 7 .
B.
On the same day it passed Ordinance No. 167, i.e. , on June 27, 2018, the Cincinnati City Council passed, also as an emergency measure, Ordinance No. 163-2018. Part of the budget proposal originally presented by the Mayor of Cincinnati, Ordinance No. 163 amended, inter alia , certain provisions of Chapter 895 of the Cincinnati Municipal Code so as to significantly increase certain permit fees associated with billboards.
Before constructing any billboard in the City of Cincinnati, a person must obtain an outdoor advertising construction permit in addition to any required building permit or *812 other permit or license. Cincinnati Municipal Code § 895-13 . Pursuant to Ordinance No. 163, the cost for the outdoor advertising construction permit increased from $70 to $280. Ordinance No. 167-2018, sec. 5 . Additionally, the City's director of buildings and inspections "has the duty to inspect the construction of outdoor advertising signs" to ensure "the construction has been completed in accordance with all applicable codes." Cincinnati Municipal Code § 895-13 . Thereupon, the director issues a permit number for the individual billboard which must be displayed, together with the owner's name, on the billboard or accompanying structure so that it is visible from the public right-of-way. Cincinnati Municipal Code § 895-13 .
Ordinance No. 163 also increased the frequency by which owners of billboards must renew an outdoor advertising permit, as well as increasing the fees associated with each renewal application. While owners of billboards previously renewed such permits on a biennial basis, Ordinance No. 163 now mandates annual renewals. And in terms of the fee structure for a renewal permit if the owner of a billboard filed a verified certification that each billboard was being displayed and maintained in accordance with Chapter 895 of the Cincinnati Municipal Code, the fee increased, pursuant to Ordinance No. 163, from $20 to $160 for each billboard face, see Cincinnati Municipal Code § 895-19(a) ; if the owner simply applied to the City's director of building and inspections for the City to conduct inspection of a billboard to ensure compliance with the requirements of Chapter 895, the fee increased, pursuant to Ordinance No. 163, from $40 to $160 for each billboard face, see Cincinnati Municipal Code § 895-19(b) ; but if an owner failed to undertake either of the two foregoing options, then the City still inspected the billboard but, in such a scenario, the fee for the renewal permit increased, pursuant to Ordinance No. 163, from $50 to $400 for each billboard face, see Cincinnati Municipal Code § 895-19(c) .
C.
LAMAR and NORTON are long-established owners of billboards within the City of Cincinnati. With approximately 450 and 415 billboards within the City, respectively, LAMAR and NORTON own the bulk of the billboards within the City. In previous years, LAMAR and NORTON would undertake the biennial process of renewing the permits for their billboards through the self-certification process pursuant to Cincinnati Municipal Code § 895-19(b) and paying the $20 fee for each billboard face.
Following enactment of Ordinance Nos, 167 & 163, LAMAR and NORTON commenced separate lawsuits challenging the constitutionality of the provisions related to the newly-enacted billboard tax and the increase in the costs and frequency of new construction or renewal permits for billboards. Following extensive oral argument by counsel for all parties on July 30, 2018, and with an adequate showing having been made, the Court issued a Temporary Restraining Order precluding the CITY OF CINCINNATI and various City officials from undertaking actions to implement or otherwise enforce either of the Ordinances as they relate to billboards. Pursuant to agreement of all parties, the Temporary Restraining Order remained in place and in effect beyond the 14-day limit provided for in Ohio R. Civ. P. 65.
A hearing on the Motions for Preliminary Injunction commenced on September 7, 2018, and continued in progress to subsequent days during the ensuing month. The parties tendered testimonial and documentary evidence addressing, generally speaking, the communicative nature of billboards, the impact of the billboard *813 tax and the impact which increased fees will have on LAMAR and NORTON (as well as on billboard advertising in general), and the actions taken or anticipated to be taken by the City under the newly enacted provisions. Following closing arguments, the matter is now before the Court for consideration of the Motions for Preliminary Injunction .
D.
After commencement of this action and submission of the Motions for Preliminary Injunction , the Cincinnati City Council passed Ordinance 323-2018 as an emergency measure without any discussion or debate. See Notice of Additional Authority .[4] Declaring that passage was necessary "to restore fees for certain outdoor advertising sign permits and renewals to pre-existing levels to ensure fees assessed and charged by the City of Cincinnati are reasonably related to the costs impacts of the services giving rise to liability for those fees", Ordinance 2018-323, sec. 5 , Ordinance No. 323 returned the fee for the outdoor advertising construction permit to that which it was prior to adoption of Ordinance No. 163,[5] as well as doing the same for the fees for a renewal permit and restoring the biennial renewal period.
II.
"The purpose of a preliminary injunction is to preserve the status quo of the parties pending final adjudication of the case upon the merits." Yudin v. Knight Industries Corp. , 109 Ohio App.3d 437, 439, 672 N.E.2d 265 (6th Dist. 1996). "The status quo to be preserved by a preliminary injunction is the last, actual, peaceable, uncontested status which preceded the pending controversy." Obringer v. Wheeling & Lake Erie Ry. Co. , 2010-Ohio-601, 2010 WL 597363, ¶ 19 (3d Dist.) (quoting Postma v. Jack Brown Buick, Inc. , 157 Ill.2d 391, 193 Ill.Dec. 166, 626 N.E.2d 199, 202 (1993) ); accord Neamonitis v. Gilmour Academy , 2009-Ohio-2023, 2009 WL 1156544, ¶¶ 11-12 (8th Dist.) (trial court maintained status quo by ordering a school, via temporary restraining order, to reinstate a student it had expelled).
Thus, notwithstanding the fact that Ordinance Nos. 167 & 163 became effective on July 1, 2018, the Court considers the status quo to possibly be maintained through the issuance of a preliminary injunction *814 as the status quo ante adoption of the Ordinances. Such consideration is further appropriate in light of the quick nature by which both Ordinances were passed by the Cincinnati City Council as emergency measures with minimal advance public notice.
"Whether to grant or deny an injunction is a matter within the discretion of the trial court." Electronic Classroom of Tomorrow v. Ohio Dep't of Ed. , 92 N.E.3d 1269, 2017-Ohio-5607 ¶ 33 (10th Dist.). "In deciding whether a preliminary injunction should issue, a court should consider (1) the likelihood of success on the merits; (2) whether the party seeking the injunction will be irreparably harmed absent an injunction; (3) the harm to others if the injunction is granted; and (4) the public's interest in granting an injunction." Aero Fulfillment Servs., Inc. v. Tartar , 2007-Ohio-174, 2007 WL 120695, ¶ 22 (1st Dist.). But "[i]n determining whether to grant injunctive relief, courts have recognized that no one factor is dispositive. The four factors must be balanced, moreover, with the 'flexibility which traditionally has characterized the law of equity,' " Cleveland v. Cleveland Elec. Illum. Co. , 115 Ohio App.3d 1, 14, 684 N.E.2d 343 (8th Dist. 1996) (quoting Friendship Materials, Inc. v. Michigan Brick, Inc. , 679 F.2d 100, 105 (6th Cir. 1982) ). Accordingly, "[w]hen there is a strong likelihood of success on the merits, preliminary injunctive relief may be justified even though a plaintiff's case of irreparable injury may be weak. In other words, what plaintiff must show as to the degree of irreparable harm varies inversely with what plaintiff demonstrates as to its likelihood of success on the merits." Cleveland v. Cleveland Elec. Illum. Co. , 115 Ohio App.3d 1, 14, 684 N.E.2d 343 (1996).
A.
"When a party seeks a preliminary injunction on the basis of a potential constitutional violation, 'the likelihood of success on the merits often will be the determinative factor.' " Liberty Coins, LLC v. Goodman , 748 F.3d 682, 689 (6th Cir. 2014) (quoting Obama for America v. Husted , 697 F.3d 423, 436 (6th Cir. 2012) (quoting Jones v. Caruso , 569 F.3d 258, 265 (6th Cir. 2009) ) ); accord Sindicato Puertorriqueno de Trabajadores v. Fortuno , 699 F.3d 1, 10 (1st Cir. 2012) ("[ i]n the First Amendment context, the likelihood of success on the merits is the linchpin of the preliminary injunction analysis"). Thus, in balancing the four preliminary-injunction factors in a case involving potential constitutional violations such as that sub judice , nearly dispositive significance must be afforded to the likelihood-of-success analysis.
1.
With respect to the billboard tax imposed pursuant to Ordinance No. 167, LAMAR and NORTON make various constitutional challenges under both the United States Constitution and the Ohio Constitution. Because the Court ultimately concludes a sufficient showing of entitlement to the issuance of preliminary injunction has been made based upon one of these constitutional bases, i.e. , the challenge based upon the First Amendment, the Court need not consider other alternative bases that might also support the issuance of a preliminary injunction.
a.
LAMAR and NORTON challenge the billboard tax imposed by Ordinance No. 167 as violating the First Amendment and the comparable provision of the Ohio Constitution. Generally speaking, they maintain, inter alia , that the tax impermissibly targets a select segment of speakers and singles out a distinct form of speech, *815 i.e. , billboard advertising, for the imposition of the tax. See Lamar Complaint ¶¶ 90-103; Norton Complaint ¶¶ 54-70.
In considering this issue, the Court is mindful that the Supreme Court "has often faced the problem of applying the broad principles of the First Amendment to unique forums of expression." Metromedia, Inc. v. City of San Diego , 453 U.S. 490, 500, 101 S.Ct. 2882, 69 L.Ed.2d 800 (1981). As a result, the Supreme Court has appropriately recognized that "[e]ach method of communicating ideas is 'a law unto itself and that law must reflect the 'differing natures, values, abuses and dangers' of each method." Id. at 501, 101 S.Ct. 2882 (quoting Kovacs v. Cooper , 336 U.S. 77, 97, 69 S.Ct. 448, 93 L.Ed. 513 (1949) (Jackson, J., concurring); accord Cafe Erotica of Fla., Inc. v. St. Johns County , 360 F.3d 1274, 1285 (11th Cir. 2004) (" 'the law of billboards' is 'a law unto itself' "). Nonetheless, "[b]illboards are a well-established medium of communication, used to convey a broad range of different kinds of messages." Metromedia , 453 U.S. at 501, 101 S.Ct. 2882. Thus, it is beyond cavil that billboards enjoy protection under the First Amendment as a direct means of disseminating speech, both commercial and non-commercial.[6] Id. at 524, 101 S.Ct. 2882 ("billboards are a medium of communication warranting First Amendment protection")(Brennan, J., concurring); see Prime Media, Inc. v. City of Brentwood, Tenn. , 398 F.3d 814, 818 (6th Cir. 2005).
Yet, notwithstanding the First Amendment interests involved in the context of billboards, certain governmental regulation is permissible of the medium. Governments have a legitimate interest in controlling certain non-communicative aspects of billboards. Metromedia , 453 U.S. at 502, 101 S.Ct. 2882 ; accord View Outdoor Advertising, LLC v. Town of Schererville Bd. of Zoning Appeals , 86 F.Supp.3d 891, 894-95 (N.D. Ind. 2015). And, thus, generally speaking, content-neutral time, place or manner regulations of billboards are permissible to advance aesthetics and traffic safety. National Advertising Co. v. City of Orange , 861 F.2d 246, 249 (9th Cir. 1988) ("[u]nder Metromedia , the City's interests in traffic safety and aesthetics are sufficient to justify continued content-neutral regulation of the noncommunicative aspects of billboards, such as size, spacing and design"); RTM Media, L.L.C. v. City of Houston , 518 F.Supp.2d 866, 875 (S.D. Tex. 2007) ("[t]he City can impose content neutral restrictions on time, place, and manner without reference to the content of the regulated speech and that are directly related to their goals, e.g. , restricting the overall number of billboards it permits, their location, size, etc. ").
But the billboard tax imposed by Ordinance No. 167 is not an effort by the Cincinnati City Council to regulate the time, place or manner of billboards nor does the Ordinance seek to advance governmental *816 interests of aesthetics or public safety. Instead, through the adoption of Ordinance No. 167, the Cincinnati City Council has directly and unequivocally isolated and targeted for taxation a small group that owns and controls the means or instruments used exclusively for the exercise of First Amendment rights, as well as imposing the tax upon those means or instruments, i.e. , the billboards themselves. Thus, ease law addressing the noncommunicative aspects of billboard regulations, e.g. , size, spacing, location, etc. , are inapposite to the issue sub judice. Instead, the case sub judice must be considered in the context of efforts by governments to impose direct taxes upon the exercise of constitutional rights or upon the means or instruments by which such rights are exercised, as well as in situations of targeting such a tax to a small or narrow group owning such means or instruments.
Generally speaking, First Amendment activities are not immunized from "any of the ordinary forms of taxation for support of the government." Grosjean v. American Press Co. , 297 U.S. 233, 250, 56 S.Ct. 444, 80 L.Ed. 660 (1936). However, "[t]he exaction of a tax as a condition to the exercise of the great liberties guaranteed by the First Amendments is as obnoxious as the imposition of a censorship or a previous restraint." Follett v. Town of McCormick, S.C. , 321 U.S. 573, 577, 64 S.Ct. 717, 88 L.Ed. 938 (1944). In fact, the history and circumstances which antedated and attended the adoption of the First Amendment confirm an appropriate hostility should attend any effort by a government to target deliberately and directly for taxation the means or instruments of exercising First Amendment rights. See generally Grosjean , 297 U.S. at 245-49, 56 S.Ct. 444 (providing overview of colonial history of efforts by the English to tax the means of speech and of the press through imposition of stamp taxes and how such efforts served as the basis for advancement of the First Amendment); Jones v. City of Opelika , 316 U.S. 584, 616 n.10, 62 S.Ct. 1231, 86 L.Ed. 1691 (1942) (Murphy, J., dissenting) ("[s]tamp taxes for purely revenue purposes were successfully resisted in Massachusetts in 1757 and again in 1785 on the ground that they interfered with freedom of the press"), judgment vacated , 319 U.S. 103, 63 S.Ct. 890, 87 L.Ed. 1290 (1943).
Thus, "[the Supreme Court] [has] kept faith with the Founders' tradition by prohibiting the selective taxation of the press. And [it has] done so whether the tax was the product of illicit motive or not.... A tax on a newspaper's advertising revenue does not prohibit anyone from saying anything ..... Yet it is unquestionably a violation of the First Amendment." McConnell v. Federal Election Comm'n , 540 U.S. 93, 253, 124 S.Ct. 619, 157 L.Ed.2d 491 (2003) (Scalia, J., concurring in part, dissenting in part), overruled , Citizens United v. Federal Elec. Comm'n , 558 U.S. 310, 365-66, 130 S.Ct. 876, 175 L.Ed.2d 753 (2010). And "[t]he language of the First Amendment does not place any greater emphasis on freedom of the press than it does on freedom of speech." Rimmer v. Colt Industries Operating Corp. , 495 F.Supp. 1217, 1224 (W.D. Mo. 1980), rev'd on other grds. , 656 F.2d 323 (8th Cir. 1981) ; see also First Nat'l Bank of Boston v. Bellotti , 435 U.S. 765, 802, 98 S.Ct. 1407, 55 L.Ed.2d 707 (1978) (Burger, C.J., concurring)("[b]ecause the First Amendment was meant to guarantee freedom to express and communicate ideas, [there is] no difference between the right of those who seek to disseminate ideas by way of a newspaper and those who give lectures or speeches and seek to enlarge the audience by publication and wide dissemination"). Thus, that which Justice Scalia *817 characterized in McConnell as clearly being unconstitutional, i.e. , to impose a tax on a newspaper's advertising revenue through a selective taxation of the press, applies a fortiori to a tax directed towards and imposed selectively upon similar means by which First Amendment rights are exercised.
"An unlimited power to tax involves, necessarily, a power to destroy." McCulloch v. Maryland , 17 U.S. (4 Wheat.) 316, 327, 4 L.Ed. 579 (1819) ; accord Murdock v. Pennsylvania , 319 U.S. 105, 112, 63 S.Ct. 870, 87 L.Ed. 1292 (1943) ("the power to tax the exercise of a [constitutional] privilege is the power to control or suppress its enjoyment").[7] And "[a] power to tax differentially, as opposed to tax generally, gives a government a powerful weapon against the taxpayer selected." Minneapolis Star & Tribune Co. v. Minnesota Comm'r of Revenue , 460 U.S. 575, 585, 103 S.Ct. 1365, 75 L.Ed.2d 295 (1983). Thus, any effort by a government to impose a tax upon the means or instruments used to engage exclusively in First Amendment rights, as well as doing so by targeting a small segment of the population, presents a very real potential to destroy, i.e. , to stifle, the meaningful and effective exercise of such rights. Nonetheless, precedent dictates that "a tax that discriminates among speakers is constitutionally suspect only in certain circumstances." Leathers v. Medlock , 499 U.S. 439, 444, 111 S.Ct. 1438, 113 L.Ed.2d 494 (1991). In assessing the distinction between permissible taxes versus unconstitutional taxes upon the means or instruments of exercising such fundamental rights and in the context of the billboard tax sub judice , this Court must be guided by various decisions of the United States Supreme Court, viz. , Grosjean ; Minneapolis Star ; and the analysis and distinguishment of these cases in Leathers.
In Grosjean , the Court found unconstitutional a 2% tax on gross receipts from advertising imposed against publications with weekly circulations above 20,000 - a tax that fell exclusively on 13 newspapers while not taxing four daily newspapers and 120 weekly publications. Similar to the contentions of the CITY OF CINCINNATI in the case sub judice , the challenged tax in Grosjean specifically targeted and assessed the tax against publications, i.e. , a means used to exercise First Amendment rights, and was "designated a 'license tax for the privilege of engaging in such business,' that is to say, the business of selling, or making any charge for, advertising." Grosjean , 297 U.S. at 244, 56 S.Ct. 444. Additionally, comparable to the billboard tax sub judice , the tax in Grosjean was *818 assessed against the gross revenues of the newspapers. Id. In finding such a targeted tax to violate the First Amendment, the Court declared that "[t]he tax here involved is bad not because it takes money from the pockets of the [newspapers engaging in advertising]. If that were all, a wholly different question would be presented. It is bad because, in the light of its history and of its present setting, it is seen to be a deliberate and calculated device in the guise of a tax to limit the circulation of information to which the public is entitled in virtue of the constitutional guaranties." Id. at 250, 56 S.Ct. 444.
Concededly, there is no indication that the Cincinnati City Council adopted the billboard tax sub judice as a deliberate or calculated device to restrict the circulation of information. But Supreme Court precedent has "consistently held that '[i]llicit legislative intent is not the sine qua non of a violation of the First Amendment.' " Simon & Schuster, Inc. v. Members of New York State Crime Victims Bd. , 502 U.S. 105, 117, 112 S.Ct. 501, 116 L.Ed.2d 476 (1991) (quoting Minneapolis Star , 460 U.S. at 592, 103 S.Ct. 1365 ). Thus, an improper censorial motive is not required in order for a directed or targeted tax to be invalidated on the basis of the First Amendment. See Minneapolis Star , 460 U.S. at 592, 103 S.Ct. 1365.
Following Grosjean , the Supreme Court next considered in Minneapolis Star the constitutionality of "a special tax that applie[d] only to certain publications protected by the First Amendment." Minneapolis Star , 460 U.S. at 581, 103 S.Ct. 1365. The particular tax at issue in Minneapolis Star specifically targeted and was imposed only upon the costs of paper and ink products consumed in the production of a publication, id. at 578, 103 S.Ct. 1365, an activity the Court's ensuing analysis clearly recognized as implicating the protections of the First Amendment. While acknowledging that "the States and the Federal Government can subject newspapers to generally applicable economic regulations without creating constitutional problems," id. at 581, 103 S.Ct. 1365, the Court rejected the claim by the government that the tax at issue was simply part of the general scheme of taxation. Instead, the Court aptly characterized the tax as "facially discriminatory, singling out publications for treatment." Id. Accordingly, the Supreme Court held that such a tax, targeted towards a narrow and selected medium directly involved the exercise of First Amendment rights, was unconstitutional.
But in response to Grosjean and Minneapolis Star , the CITY OF CINCINNATI attempts to find solace in the subsequent decision of the Court in Leathers. Leathers involved a constitutional challenge by cable television operators to a sales tax that excluded or exempted sales made by certain segments of the media, i.e. , over-the-counter newspaper sales and subscription magazine sales, but not other sales, including, the sale of cable television services. But unlike the tax scheme involved in Grosjean and Minneapolis Star , the tax in Leathers was "a tax of general applicability" that applied to:
receipts from the sale of all tangible personal property and a broad range of services, unless within a group of specific exemptions. Among the services on which the tax [was] imposed [were] natural gas, electricity, water, ice, and steam utility services; telephone, telecommunications, and telegraph service; the furnishing of rooms by hotels, apartment hotels, lodging houses, and tourist camps; alteration, addition, cleaning, refinishing, replacement, and repair services; printing of all kinds; tickets for admission to places of amusement or athletic, entertainment, or recreational *819 events; and fees for the privilege of having access to, or use of, amusement, entertainment, athletic, or recreational facilities.
Leathers , 499 U.S. at 447, 111 S.Ct. 1438. Thus, the tax in Leathers did not violate the First Amendment because it was "a generally applicable tax" that simply "exclude[d] or exempt[ed] certain media from a generally applicable tax", id. at 447 & 453, 111 S.Ct. 1438, and was "[u]nlike the taxes involved in Grosjean and Minneapolis Star " wherein the government "selected a narrow group to bear fully the burden of the tax." Id. at 448, 111 S.Ct. 1438.
Succinctly stated, the proposition leading from Grosjean , Minneapolis Star , and Leathers is that, in the exercise of its taxing powers, the government may not single out and direct or target a tax solely at the exercise of First Amendment rights or at the means or instruments utilized in exercising First Amendment rights nor may the government impose a tax that targets a small narrow group to bear the burden of the tax.[8] Leathers , 499 U.S. at 447, 111 S.Ct. 1438. Yet, that is precisely what the CITY OF CINCINNATI has done through enactment of Ordinance No. 167, i.e. , targeted for taxation a small group that owns and controls the means or instruments used exclusively in the exercise of First Amendment rights and, then, imposing a discriminatory tax upon those means or instruments.
While the Supreme Court found the tax at issue in Grosjean unconstitutional without subjecting it to any further analysis, the Court in Minneapolis Star set forth a variation of strict scrutiny analysis to be applied:
Differential taxation of the press, then, places such a burden on the interests protected by the First Amendment that we cannot countenance such treatment unless the State asserts a counterbalancing interest of compelling importance that it cannot achieve without differential taxation.
Minneapolis Star , 460 U.S. at 585, 103 S.Ct. 1365. While recognizing that the raising of revenue is critical to any government, the Court still found in Minneapolis Star such a proposition inadequate to allow the imposition of a differential tax upon a small group that owns and controls the means or instruments used exclusively for the exercise of First Amendment rights or the imposition of a tax upon those means or instruments. Raising revenue for the government alone "cannot justify the special treatment of [First Amendment rights], for an alternative means of achieving the same interest without raising concerns under the First Amendment is clearly available: the State could raise the revenue by taxing businesses generally."
*820 Id. at 586, 103 S.Ct. 1365. In fact, the Cincinnati Budget Director testified that the City has significant alternatives under state law to make up for any revenue shortfalls other than a tax on billboards.
Furthermore, with respect to the billboard tax sub judice , its adoption by the Cincinnati City Council was not precipitated by the need to fund core or basic governmental services of a large municipality, such as police, fire, water, sewers, roads, bridges, etc. See Foley v. Connelie , 435 U.S. 291, 297, 98 S.Ct. 1067, 55 L.Ed.2d 287 (1978) ("[a] discussion of the police function is essentially a description of one of the basic functions of government... The police function fulfills a most fundamental obligation of government to its constituency"); see also Heck v. City of Freeport , 985 F.2d 305, 309 (7th Cir. 1993) (identifying the "basic services" of government as "police and fire protection as well as 'quasi-utility functions' like water, garbage, and sewage services"). The Office of the Mayor had submitted a balanced budget to the Cincinnati City Council that addressed such matters; but once individual members of Cincinnati City Council had the opportunity to add their own pet projects into the budget, the once-balanced budget proposal faced a projected shortfall of $2.5 million; the billboard tax sub judice was part of the solution to make up that deficit, though several other options existed to address the shortfall.[9]
While the CITY OF CINCINNATI may have the legal authority arguendo to undertake and support such pet projects, they are not of the nature of being core or basic governmental functions or services. Thus, while the raising of revenue is critical to any government, "the persistent search for new subjects of taxation" in order to address government beyond its fundamental functions cannot be the fountainhead for the imposition of taxes against a small group that owns and controls the means or instruments used exclusively for the exercise of First Amendment rights or against those means or instruments. See Grosjean , 297 U.S. at 250, 56 S.Ct. 444. The CITY OF CINCINNATI has not demonstrated a compelling interest for the imposition of the selective and targeted billboard tax to the exclusion of other alternatives for the raising of revenue.[10]
*821 "[C]ourts must be wary that taxes, regulatory laws, and other laws that impose financial burdens are not used to undermine freedom of the press and freedom of speech. Government can attempt to cow the media in general by singling it out for special financial burdens. Government can also seek to control, weaken, or destroy a disfavored segment of the media by targeting that segment." Pitt News v. Pappert , 379 F.3d 96, 110-11 (3d Cir. 2004). LAMAR and NORTON have adequately demonstrated that the billboard tax sub judice singles out privately-owned billboards for a unique financial burden unrelated to the intrinsic aspects of such billboards that might warrant a certain level of regulation or the imposition of a financial burden.
The deliberate and directed imposition of the billboard tax sub judice upon a targeted means or instrument of engaging in speech such that the tax is imposed *822 against a small and narrow group which must bear the entire burden of the tax is sufficiently akin to the taxes found unconstitutional in Grosjean and Minneapolis Star & Tribune. As such, the Court finds that LAMAR and NORTON have adequately demonstrated a substantial likelihood of success on the merits that the billboard tax sub judice violates the First Amendment consistent with the legal precedent from the Supreme Court.[11]
b.
Independent of whether the billboard tax itself satisfies constitutional muster under the First Amendment, etc. , LAMAR and NORTON also contend that the explicit prohibition against disclosure or identification of the tax to its customers, see Cincinnati Municipal Code § 313-7(a) & Cincinnati Municipal Code § 313-7(b) , constitutes a content-based restriction of its free speech rights in violation of the First Amendment and the comparable provision of the Ohio Constitution. See Lamar Complaint ¶ 125-32 ; Norton Complaint ¶¶ 27-37 . Conceding such prohibitions directly implicate First Amendment rights, the CITY OF CINCINNATI maintains such prohibitions are constitutionally permissible as protecting against false or misleading commercial speech. City's Memorandum in Opposition to Motion for Preliminary Injunction, at 26-28.
In BellSouth Telecommunications, Inc. v. Farris , 542 F.3d 499 (6th Cir. 2008), the Sixth Circuit considered, similar to that sub judice , a challenge by telecommunications providers to a prohibition precluding them from identifying a "new tax [on their gross revenues] as a line item on all customer invoices to explain why [the providers] have raised prices." Id. at 500. The no-stating-the-tax provision in BellSouth simply, though broadly, precluded the providers from "separately stat[ing] the tax on the bill", id. (quoting Ky. Rev. Stat. Ann. § 136.616(3) ); though less succinct, the no-stating-the-tax provision sub judice is similarly stated:
The tax shall not be stated or charged separately from the rent or other consideration paid by an advertiser for use or occupancy of an outdoor advertising sign or shown separately on any record thereof, or otherwise reflected upon any bill, statement, or charge made for the sign's use or occupancy issued or delivered by the advertising host.
Cincinnati Municipal Code § 313-7(a). And an additional prohibition is imposed upon what outdoor advertisers, such as LAMAR and NORTON, may advise their customers:
No advertising host shall state in any manner, whether directly or indirectly, that the tax or any part thereof will be assumed or absorbed by an advertiser, or that it will be added to the rent or other charge.
Cincinnati Municipal Code § 313-7(b).
The CITY OF CINCINNATI maintains such restrictions (or, more accurately, prohibitions) are simply a regulation of commercial speech and, thus, subject to lesser constitutional protection under the analysis *823 provided for in Central Hudson Gas & Electric Corp. v. Public Service Comm'n of New York , 447 U.S. 557, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980). But the ease with which the CITY OF CINCINNATI categorizes the no-stating-the-tax provisions sub judice as commercial speech is belied by BellSouth :
While the no-stating-the-tax clause by its terms restricts speech, the question is what kind: Does it regulate commercial speech or other protected speech? Should we thus apply the four-part, commercial-speech test, or the more rigorous scrutiny that applies to content-based regulations of other types of protected speech?
In one sense, the law looks like it regulates commercial speech, which the Court variously has defined as "expression related solely to the economic interests of the speaker and its audience." The [government] does not wish to regulate the providers' speech about the new tax in any venue but one: a commercial invoice....
In another sense, the law looks like a ban on core political speech. Just because an "economic motivation" underlies speech, we know, does not "by itself" convert it into "commercial speech." And what is going on here is more than just a debate about how best to sell toothpaste or, as here, telephone services. It is about announcing who bears political responsibility for a new tax and about doing so in the forum most likely to capture voters' attention: an invoice that displays a predictable consequence of the tax. At the same time that the law limits the providers' efforts to duck economic responsibility for a price increase, it permits legislators to duck political responsibility for the new tax....
Perhaps our difficulty in placing a label on the law suggests it is a hybrid, one that implicates commercial and political speech, that implicates the interests of consumers and voters and that draws its heritage as much from protests over the Townshend Acts as from the Wealth of Nations. If that is the case, we presumably would apply the more rigorous scrutiny....
While it may often be the case that a " 'commonsense' distinction" will divide commercial speech from other speech, this is not one of those cases. It remains difficult to pin down where the political nature of these speech restrictions ends and the commercial nature of the restrictions begins....
BellSouth , 542 F.3d at 504-05 (internal citations omitted); cf. Board of Trustees of State Univ. of N.Y. v. Fox , 492 U.S. 469, 474, 109 S.Ct. 3028, 106 L.Ed.2d 388 (1989) (discussing whether "pure speech and commercial speech" were inextricably intertwined, so that "the entirety must ... be classified as noncommercial").[12]
In BellSouth, the Sixth Circuit did not need to resolve the nature of the speech involved, i.e. , commercial versus political speech, because the no-stating-the-tax provision therein failed to satisfy the lesser constitutional standard applicable to commercial speech under Central Hudson . Id. at 500 ("[w]hether the no-stating-the-tax *824 provision is more akin to a price-advertising ban (governed by the commercial-speech doctrine) or to a ban on protesting a new tax in the forum most likely to get consumers' attention (governed by the political-speech doctrine) need not detain us. For it fails to satisfy even the intermediate scrutiny that applies to restrictions on commercial speech").
In applying Central Hudson in BellSouth, the Sixth Circuit readily found the no-stating-the-tax provision as a regulation of speech; the CITY OF CINCINNATI also acknowledges its comparable provisions are content-based regulations of speech. City's Memorandum in Opposition to Motion for Preliminary Injunction , at 26. But in defending the no-stating-the-tax provision sub judice , the CITY OF CINCINNATI maintains that the provision is directed at false and misleading commercial speech subject to lesser protection under Central Hudson whereas, in BellSouth , "the government... 'nowhere argue[d] that the providers['] speech is false' nor could it." City's Memorandum in Opposition to Motion for Preliminary Injunction, at 26 (quoting BellSouth, 542 F.3d at 506 ).
In claiming the no-stating-the-tax provision sub judice guards against false or misleading commercial speech, the CITY OF CINCINNATI argues that such provisions "prevent[ ] [billboard owners] from misleading advertisers in the belief that the tax on [the owners] is a transactional tax [imposed on the advertising customer]." City's Memorandum in Opposition to Motion for Preliminary Injunction, at 26; see id. at 27 (claiming the no-stating-the-tax provision advances the compelling interest of "ensuring that the tax functions as an excise tax, which falls on the exercise of a business privilege and not on transactions with customers"). But such an argument by the CITY OF CINCINNATI actually focuses on the political nature of the debate on the billboard tax, especially when it declares that, if billboard owners could present information to their customers suggesting that the billboard tax is actually a tax on the customer's transaction, then "[i]t could lead to the tax being inappropriately characterized as a tax that the City may not levy." City's Memorandum in Opposition to Motion for Preliminary Injunction, at 27.
How a tax may be characterized amongst the citizenry and whether a government has the legal authority to levy such a tax does not go to proposing a commercial transaction but, instead, advances debate concerning the actions of the government and its officials which falls clearly within the ambit of political speech. Bloom v. O'Brien , 841 F.Supp. 277, 281 (D. Minn. 1993) ("[t]he itemized bill is indisputably part of a commercial transaction, but it does not propose a transaction as such. A bill is not a proposal that the patient pay for services already rendered, it is a demand for payment. Itemizing the specific dollar amount of the gross revenue tax being passed along to a patient would simply inform consumers that, in addition to charges for the medical service provided, they were also paying a share of the tax imposed on the health care provider"); compare Board of Trustees of State University of New York v. Fox , 492 U.S. 469, 473-74, 109 S.Ct. 3028, 106 L.Ed.2d 388 (1989) ("the test for identifying commercial speech" is whether the speech proposes a commercial transaction) with Meyer v. Grant , 486 U.S. 414, 422, 108 S.Ct. 1886, 100 L.Ed.2d 425 (1988) (core political speech is "interactive communication concerning political change") and Buckley v. Valeo, 424 U.S. 1, 14, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) (political speech includes "discussion of public issues"); see also United States v. Bell , 414 F.3d 474, 479 (3d Cir. 2005) ("[t]o determine whether *825 speech is commercial, courts should consider whether: (1) the speech is an advertisement; (2) the speech refers to a specific product or service; and (3) the speaker has an economic motivation for the speech. An affirmative answer to each question indicates 'strong support' for the conclusion that the speech is commercial"). By prohibiting disclosure of the billboard tax and the additional costs resulting to the customer by the tax - be it on a bill, statement or otherwise - the CITY OF CINCINNATI is not seeking to prevent the disclosure of false or deceptive information in a commercial transaction; instead, the prohibition is nothing more than an attempt to compel silence and force the billboard owners to suffer the retribution of its customers (or loss of customers) because of increased costs when the real culprit or villain for such increased costs is the government. When governmental action causes increased costs, public officials cannot avoid accountability or responsibility for such actions by precluding the dissemination of information identifying the true source of such increased costs. Yet, that is precisely what the CITY OF CINCINNATI has done through the no-stating-the-tax provision sub judice.
The no-stating-the-tax provision sub judice ("[t]he tax shall not be stated or charged separately from the rent or other consideration paid by an advertiser...or shown separately on any record thereof, or otherwise reflected upon any bill, statement, or charge") is a content-based prohibition on non-commercial speech and, as such, is subject to strict scrutiny analysis. North Olmsted Chamber of Commerce v. City of N. Olmsted , 86 F.Supp.2d 755, 767 (N.D. Ohio 2000) ("content-based restrictions on noncommercial speech receive strict scrutiny"). Relying upon its contention that such prohibition is simply a regulation of commercial speech, the CITY OF CINCINNATI has failed to posit any putative compelling interest to justify the prohibition, let alone how it is narrowly tailored so as to be the least restrictive means to achieve such interest. See Bible Believers v. Wayne County, Mich. , 805 F.3d 228, 248 (6th Cir. 2015) ("[n]o state action that limits protected speech will survive strict scrutiny unless the restriction is narrowly tailored to be the least-restrictive means available to serve a compelling government interest"). Accordingly, LAMAR and NORTON have demonstrated a substantial likelihood of success on the merits that the no-stating-the-tax provision sub judice is unconstitutional as being violative of the First Amendment.
Concededly, part of the prohibition on speech imposed by Cincinnati Municipal Code § 313-7(b), i.e. , precluding billboard owners from "stat[ing] in any manner, whether directly or indirectly, that the tax or any part thereof will be assumed or absorbed by an advertiser" is, in a certain sense, less political in nature than the no-stating-the-tax provision sub judice . However, the ensuing part of the prohibition, i.e. , precluding billboard owners from "stat[ing] in any manner, whether directly or indirectly, that [the tax] will be added to the rent or other charge" reverts back to being more political in nature as the prohibition tends to direct responsibility and criticism for the increased costs away from the government that actually caused the increase costs. But in considering the First Amendment implications of the prohibition in Cincinnati Municipal Code § 313-7(b), the Court need not definitely resolve whether the appropriate analysis to be undertaken is pursuant to the commercial speech rubric versus being a content-based regulation of political speech.
"Broad prophylactic rules in the area of free expression are suspect. Precision of regulation must be the touchstone *826 in an area so closely touching our most precious freedoms." NAACP v. Button , 371 U.S. 415, 438, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963) (internal citations omitted). And this principle is true even in the context of regulations of commercial speech. See Edenfield v. Fane , 507 U.S. 761, 777, 113 S.Ct. 1792, 123 L.Ed.2d 543 (1993). At the hearing on the Motions for Preliminary Injunction , the representative of the CITY OF CINCINNATI could not provide any clear and definitive indication as to what language a billboard owner could utilize without running afoul of the prohibition in Cincinnati Municipal Code § 313-7(b) while still desiring to indicate clearly to a customer that increased costs were the result of the imposition of the billboard tax by the government. Instead, it quickly became apparent that a billboard owner would need to engage in linguistic gymnastics in order to avoid (or, more accurately, hopefully avoid) running afoul of the prohibition.
"Condemned to the use of words, we can never expect mathematical certainty from our language." Grayned v. City of Rockford , 408 U.S. 104, 109, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972). A certain amount of "flexibility and reasonable breadth, rather than meticulous specificity" is in order. Id. (quoting Esteban v. Central Missouri State College , 415 F.2d 1077, 1088 (8th Cir. 1969) (Blackmun, J.) ). But when an absolute prohibition on speech is under taken through the use of broad all-encompassing language, such as the use in Cincinnati Municipal Code § 313-7(b) of "in any manner" or "directly or indirectly", the real and imminent threat exists that protected speech will be chilled.
A law is overbroad under the First Amendment if it "reaches a substantial number of impermissible applications" relative to the law's legitimate sweep. The overbreadth doctrine exists "to prevent the chilling of future protected expression." Therefore, any law imposing restrictions so broad that it chills speech outside the purview of its legitimate regulatory purpose will be struck down.
Deja Vu of Nashville, Inc. v. Metropolitan Government of Nashville and Davidson County, Tenn. , 274 F.3d 377, 387 (6th Cir. 2001) (quoting New York v. Ferber, 458 U.S. 747, 771, 102 S.Ct. 3348, 73 L.Ed.2d 1113 (1982), and Staley v. Jones , 239 F.3d 769, 779 (6th Cir. 2001), respectively).
If we are dealing with commercial speech, then an explicit restriction on billboard owners stating that the billboard tax "will be assumed by an advertiser" may arguendo satisfy constitutional muster under Central Hudson (as the tax liability is that of the billboard owners not the customers). But when the CITY OF CINCINNATI expands such a prohibition so as to include it being done "in any manner" or done "directly or indirectly", then the precision of regulation required under the First Amendment no longer exists, especially when considered with the other prohibitions contained within Cincinnati Municipal Code § 313-7(b).[13] The testimony of *827 the City's own representative raised more questions and indefiniteness with respect to these prohibitions than they answered.
When "[m]en of common intelligence must necessarily guess at [a statute's or ordinance's] meaning and differ as to its application", the requisite precision of regulation is absent and the statute or ordinance cannot satisfy constitutional muster. Keyishian v. Bd. of Regents of the Univ. of the State of N.Y., 385 U.S. 589, 604, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967). Whether couched as a vagueness issue or an overbroad issue, the Court concludes that there exists a substantial likelihood that the prohibition in Cincinnati Municipal Code § 313-7(b) does not satisfy constitutional muster.
2.
With respect to the increased fees assessed for billboard permits (and the more frequent period in which such fees are charged), LAMAR and NORTON contend such fees go beyond the reasonable and legitimate expenses to administer the billboard-licensing process so as to constitute a tax. See Lamar Complaint ¶ 117-24 ; Norton Complaint ¶¶ 93-97. The CITY OF CINCINNATI concedes that if such fees are, in fact, a tax, then such the fees are impermissible and must be enjoined. See City of Cincinnati v. Criterion Advertising Co. , 32 Ohio App. 472, 168 N.E. 227 (1st Dist. 1929) ("[i]f the fee charged for the permit is largely in excess of the sum reasonably necessary to cover the cost of granting the permit, and of exercising proper police regulation, the fee is a tax, and the ordinance cannot stand"); City of Richmond Heights v. LoConti , 19 Ohio App.2d 100, 250 N.E.2d 84 (8th Dist. 1969) (syllabus ¶¶ 1, 3 & 4)("[a] law or ordinance which requires the obtaining of a license as a prerequisite to engaging in a particular business or activity may be a proper exercise of the police power, but it ... may not interfere with private business by imposing arbitrary, discriminatory, capricious or unreasonable restrictions thereon.... A license fee may be required of one required to obtain a license, but the amount of such fee must bear a reasonable relation to the burdens imposed, by the activity being licensed and by the licensing process itself, upon the governmental entity involved. Where a license fee is significantly in excess of the amount needed to support such burdens, such fee is unreasonable and therefore unconstitutional").
LAMAR and NORTON challenge four distinct billboard permit provisions in Chapter 895 of the Cincinnati Municipal Code and, in particular, the increase of the respective fees pursuant to Ordinance No. 163, viz. , (i) the increase of the fee from $70 to $280 for the outdoor advertising construction permit as provided for in Cincinnati Municipal Code § 895-13; (ii) the increase of the fee from $20 to $160 for an outdoor advertising renewal permit obtained through self-certification as provided for in Cincinnati Municipal Code § 895-19(a); (iii) the increase of the fee from $40 to $160 for an outdoor advertising renewal permit obtained through inspection by the CITY as provided for in Cincinnati Municipal Code § 895-19(b); and (iv) the increase of the fee from $50 to $400 for an outdoor advertising renewal permit through inspection by the CITY when no owner, et al. , of the billboard seeks the renewal permit as provided for in Cincinnati Municipal Code § 895-19(c). And as part of the challenge to the last three fee increases, LAMAR and NORTON also take issue with the increased period by which the outdoor advertising renewal permit must be renewed, i.e. , from a biennial basis to an annual basis.
Prior to the adoption of Ordinance No. 163, LAMAR and NORTON obtained the *828 biennial renewal permits through the self-certification process provided for within Cincinnati Municipal Code § 895-19(a). However, during this time, the CITY OF CINCINNATI undertook no action whatsoever with respect to renewal permits obtained through the self-certification process; instead, the CITY OF CINCINNATI simply accepted the biennial payments from LAMAR and NORTON for every billboard they owned, and then deposited the money into the fisc. However, the validity vel non of such action is not presently before the Court as the consideration is presently limited to the Motions for Preliminary Injunction . But see City of East Liverpool v. Staffilino, 1983 WL 6731 (7th Dist. Jan. 10, 1983) (judgment in favor of billboard-advertising companies against assessment for unpaid billboard license fees where "City admitted they have not been inspecting or in any manner servicing the signs. In short, they are charging but not giving any service to justify the charge").
Instead, the issues raised by the Motions for Preliminary Injunction go to the increased fees and the more frequent renewal period implemented through Ordinance No. 163. But, as noted above, following the commencement of this action and while the Motions were pending, the Cincinnati City Council passed Ordinance No. 323 whereby it effectively reinstated the status quo ante passage of Ordinance No. 163 as it related to both the fees associated with billboard permits and the renewal period for such permits. Thus, in light of the current status of such provisions, i.e. , effectively being the status quo ante Ordinance No. 163, the need for issuance of extraordinary relief in the form of a preliminary injunction no longer exists.[14] Accordingly, no preliminary injunction will *829 issue with respect to Chapter 895 of the Cincinnati Municipal Code.
B.
While, as noted above, the likelihood of success on the merits analysis is often determinative on the issuance vel non of a preliminary injunction on the basis of a potential constitutional violation, consideration must still be afforded to the other preliminary-injunction factors, viz. , whether movant will suffer irreparable injury absent an injunction, the harm others will suffer if the injunction is granted, and the public's interest. In the present context, these three factors tend to overlap and, thus, will be considered collectively.
The Supreme Court has made unequivocally clear that "[t]he loss of First Amendment freedoms, even for minimal periods of time, unquestionably constitutes irreparable injury." Elrod v. Burns , 427 U.S. 347, 373, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976). And while the public interest is served through the collection of taxes properly due and owing, the clear indication that the billboard tax sub judice violates the First Amendment consistent with precedent of the Supreme Court minimizes the validity of such public interest. In such a context, a greater public interest exists in ensuring governments and governmental officials operate within the confines of constitutional restrictions and prohibitions. Additionally, "it is always in the public interest to prevent violation of a party's constitutional rights." Miller v. City of Cincinnati , 709 F.Supp.2d 605, 627 (S.D. Ohio 2008) (quoting Newsom v. Norris , 888 F.2d 371, 378 (6th Cir. 1989) and Connection Distributing Co. v. Reno , 154 F.3d 281, 288 (6th Cir. 1998) (quoting G & V Lounge, Inc. v. Michigan Liquor Control Comm'n , 23 F.3d 1071, 1079 (6th Cir. 1994) ) ), aff'd 622 F.3d 524 (6th Cir. 2010).
Thus, while certain considerations may, to a limited degree, militate against the issuance of a preliminary injunction, the balance of the other preliminary-injunction factors weigh strongly in favor of the issuance of one. Based upon the testimony offered, the Court finds that the real and imminent threat exists that communications through the use of billboard would be sufficiently diminished should the billboard tax sub judice remain in place. Commercial advertisers would be confronted with realigning their advertising dollars to more efficient media of communications; charitable and public interest messages on billboards would be impacted as the gratis of LAMAR and NORTON becomes more limited; and certain billboard locations would disappear altogether as the tax would make such locations no longer economically viable. The evidence sufficiently demonstrated that, if the billboard tax sub judice remains in place, the result would be fewer voices and messages in the marketplace of ideas being transmitted to the broad general public through billboards.
III.
"[The] rule, as to the severability of statutes and the elimination of unconstitutional provisions, applies to municipal ordinances." Frecker v. City of Dayton , 153 Ohio St. 14, 26, 90 N.E.2d 851 (1950) (Taft, J., dissenting). "In order to sever a portion of a statute, [a court] must first find that such a severance will not fundamentally disrupt the statutory scheme of which the unconstitutional provision is a part." State ex rel. Maurer v. Sheward , 71 Ohio St.3d 513, 523, 644 N.E.2d 369 (1994).
To that end, Ohio law establishes a three-part test to determine whether an invalid portion of a statute or ordinance can be severed or the entire statute or ordinance must be struck down:
*830 (1) Are the constitutional and the unconstitutional parts capable of separation so that each may be read and may stand by itself? (2) Is the unconstitutional part so connected with the general scope of the whole as to make it impossible to give effect to the apparent intention of the Legislature if the clause or part is stricken out? (3) Is the insertion of words or terms necessary in order to separate the constitutional part from the unconstitutional part, and to give effect to the former only?
Geiger v. Geiger , 117 Ohio St. 451, 466, 160 N.E. 28 (1927) (quoting State v. Bickford , 147 N.W. 407, 409, 28 N.D. 36 (1913) ); accord State ex rel. Sunset Estate Properties, L.L.C. v. Lodi , 142 Ohio St.3d 351, 30 N.E.3d 934, 2015-Ohio-790 ¶ 17. "A portion of a statute [or ordinance] can be excised only when the answer to the first question is yes and the answers to the second and third questions are no." State v. Noling , 149 Ohio St.3d 327, 75 N.E.3d 141, 2016-Ohio-8252 ¶ 35.
It is clear and the CITY OF CINCINNATI has acknowledged that the imposition of the billboard tax is the sine qua non for the entirety of the newly-enacted Chapter 313 to the Cincinnati Municipal Code; stated otherwise, the billboard tax is so connected with the general scope of the whole as to make it impossible to give effect to the apparent intention of the Cincinnati City Council if the tax is stricken out while keeping the remaining provisions of Chapter 313 in placed. And if that were not sufficient, the no-stating the tax provision contained in Cincinnati Municipal Code § 313-7(a) and the other prohibition on mentioning the tax contained in Cincinnati Municipal Code § 313-7(b) sufficiently appear to suffer from constitutional infirmity as well.[15] To sever the billboard tax from other provisions of Chapter 313 would not be in harmony with the goals and intent of the Cincinnati City Council in passing Ordinance No. 167.
The billboard tax imposed by Ordinance No. 167 is the linchpin of the entirety the newly enacted Chapter 313 of the Cincinnati Municipal Code; the billboard tax or other constitutionally infirm provisions therein cannot be severed from any of the remaining provisions that satisfy constitutional muster.
IV.
Having balanced the four factors applicable to be considered with respect to the issuance vel non of a preliminary injunction, the Court finds a sufficient showing has been made demonstrating a substantial likelihood of success on the merits with respect to the First Amendment challenged to Chapter 313 of the Cincinnati Municipal Code, And while that factor is often determinative in cases, such as this, involving fundamental constitutional rights, the other factors to consider also militate sufficiently in favor of LAMAR and NORTAN qua movants to warrant the issuance of a preliminary injunction precluding the CITY OF CINCINNATI and its officials from undertaking any activities to implement or enforce any and all provisions of Chapter 313 of the Cincinnati Municipal Code. However, because the substantive *831 aspects of the changes to Chapter 895 of the Cincinnati Municipal Code effectuated by Ordinance No. 163 have, for the most part, been repealed by the Cincinnati City Council, no injunctive relief is warranted at this stage with respect to those changes.
While Ohio R. Civ. P. 65(C) appears to require the fixing of a bond in order to effectuate a preliminary injunction, state courts have followed the lead of federal courts holding that the setting of the amount of an injunctive bond is within the discretion of the Court and this includes the discretion to require no bond at all. Vanguard Transp. Sys., Inc. v. Edwards Transfer & Storage Co., Gen. Commodities Div. , 109 Ohio App.3d 786, 793, 673 N.E.2d 182 (10th Dist. 1996) ; Connor Group v. Raney , 2016-Ohio-2959, 2016 WL 2841190, ¶ ¶ 64-66 (2d Dist.) ; Colquett v. Byrd , 59 Ohio Misc. 45, 49, 392 N.E.2d 1328 (Mansfield Muni. 1979) ; see, e.g. , Johnson v. Couturier , 572 F.3d 1067, 1086 (9th Cir. 2009) (" Rule 65(c) invests the district court with discretion as to the amount of security required, if any"). In light of the analysis and assessment on the issuance vel non of a preliminary injunction, together with the overall equities of the case, including the fact that the injunction seeks to protect fundamental constitutional rights, the Court will exercise its discretion and not require the posting of an injunctive bond or, alternatively, set such bond at zero dollars ($0.00). See Baca v. Moreno Valley Unified School Dist. , 936 F.Supp. 719, 738 (C.D. Cal. 1996) (waiving the bond requirement because "to require a bond would have a negative impact on plaintiff's constitutional rights, as well as the constitutional rights of other members of the public affected by the policy"); Complete Angler, LLC v. City of Clearwater , 607 F.Supp.2d 1326, 1335 (M.D. Fla. 2009) ("[d]espite the mandatory nature of [ Rule 65(c)'s] language, federal courts have come to recognize that the district court possesses discretion over whether to require the posting of security. Waiving the bond requirement is particularly appropriate where a plaintiff alleges the infringement of a fundamental constitutional right.")
For the foregoing reasons, the Motions for Preliminary Injunction are GRANTED IN PART and DENIED IN PART. An injunction will issue forthwith consistent with the foregoing decision.
SO ORDERED.

The specific amount of the minimum annual tax on each billboard is $2 per square foot of sign face area if the billboard is not located within 660 feet of an interstate or primary highway system and, if located within 660 feet of an interstate or primary highway system, then $5 per square foot of sign face area if the billboard is non-electronic or $10 per square foot of sign face area if the billboard is electronic.

The same four categories of signs are exempt from: (a) the regulation of outdoor advertising signs (under Cincinnati Municipal Code § 895-2); and (b) the zoning regulations (under Cincinnati Municipal Code § 1427-07), viz. : (i) signs erected or displayed in the public right-of-way; (ii) signs erected or displayed on Fountain Square pursuant to rules and regulations for the use of Fountain Square; (iii) signs approved by the City for a special event or other event authorized under park board rules; and (iv) on-site signs erected or displayed on public property by the City of Cincinnati.

All obligations under Chapter 313 of the Cincinnati Municipal Code - from registration to payment of the billboard tax - are actually imposed upon the "advertising host". The term "advertising host" is broadly defined to mean "any person who owns or controls an outdoor advertising sign, including the person's agent, affiliate, employee, or other representative who acts on the person's behalf or in the interests of the person with regard to an outdoor advertising sign in the city of Cincinnati." Cincinnati Municipal Code § 313-1-A1 . Additionally, "[w]here an advertising host performs its functions through an agent of any type or character other than an employee, the agent shall also be deemed an advertising host for purposes of [Chapter 313] and shall have the same duties and liabilities as its principal."Cincinnati Municipal Code § 313-13(a) . Additionally, the fiscal officer of any advertising host is also subject to personal liability for the failure to make requisite tax return filings or the payment of the billboard tax. Cincinnati Municipal Code § 313-13(b) . Thus, under the broad definition utilized in Chapter 313 of the Cincinnati Municipal Code, the sundry obligations and liabilities relative to the billboard tax may very easily be imposed upon attorneys, lobbyists, et al. , of any outdoor advertising company.

Through the Notice of Additional Authority , the CITY OF CINCINNATI put before the Court a certified copy of Ordinance No. 323. The Court has further reviewed the governmental website of the CITY OF CINCINNATI and the publication thereon of hyperlinks to audiovisual recordings of meetings of the Cincinnati City Council (www.cincinnati-oh.gov/council/council-meeting-videos/), as well as the link to the particular meeting wherein it adopted Ordinance No. 323 (https://archive.org/details/10181010COUN). As such publication is from a governmental website and the audiovisual recording of the meeting is not subject to reasonable dispute, the Court has taken judicial notice of those proceedings (and, in particular, the audio visual recording starting at 1:14:55 when Ordinance No. 323 was considered during the course of the meeting). See State ex rel. Ohio Republican Party v. FitzGerald , 145 Ohio St.3d 92, 47 N.E.3d 124, 2015-Ohio-5056 ¶ 18 (taking judicial notice from governmental website). This review confirmed Ordinance No. 323 was passed as an emergency matter with no debate or discussion.

Ordinance No. 163 also increased the fee for a building permit. Ordinance No. 323 did not change the increased fee for building permits nor did it negate the requirement that, in addition to obtaining an outdoor advertising construction permit, a person desiring to construct a new billboard must also obtain a building permit. Thus, notwithstanding Ordinance No. 323, the CITY OF CINCINNATI has still increased the costs associated with obtaining an outdoor advertising construction permit.

Evidence at the hearing on the Motions for Preliminary Injunction established the broad scope of messages communicated through the medium of billboards. Such messages range from commercial speech to political speech to public service messages for charities or in support of law enforcement efforts. Furthermore, while most advertising appearing on billboards relay messages for the customers of LAMAR and NORTON, LAMAR and NORTON also transmit a sufficient number of their own messages on their billboards.
Additionally, because of changes in technology (especially through the use of digital billboards), the scope of messages conveyed through billboards appears to be trending to having more non-commercial messages contained on billboards in comparison to the situation decades ago when the messages on billboards were static and in place for several months.

LAMAR and NORTON take exception to the characterization by the CITY OF CINCINNATI that the billboard tax is being imposed upon "the privilege of installing, placing, and maintaining outdoor advertising signs". Ordinance No. 167-2018 (emphasis added). While, on occasions, courts have concededly characterize as a privilege the exercise of one's First Amendment rights, "First Amendment rights are part of the heritage of all persons and groups in this country. They are not to be dispensed with or withheld because [a court] or [a legislative body] thinks the person or group is unworthy."United States v. UAW-CIO , 352 U.S. 567, 597, 77 S.Ct. 529, 1 L.Ed.2d 563 (1957) (Douglas, J., dissenting). Contrary to the proposition or perspective of the CITY OF CINCINNATI, free speech is not a privilege that the government may parse out at its whim through noblesse oblige . See United States v. Stevens , 559 U.S. 460, 480, 130 S.Ct. 1577, 176 L.Ed.2d 435 (2010) ("the First Amendment protects against the Government; it does not leave us at the mercy of noblesse oblige "). Thus, notwithstanding the occasional characterization by courts or others of the exercise First Amendment rights as involving a privilege, the Court proceeds with a full appreciation that fundamental constitutional rights are involved in the case sub judice and the great importance that attend them.

The Court also considered Arkansas Writers' Project, Inc. v. Ragland , 481 U.S. 221, 107 S.Ct. 1722, 95 L.Ed.2d 209 (1987), which involved a First Amendment challenge to a tax imposed upon the sales of tangible personal property, though exempted numerous items from the tax, including "[g]ross receipts or gross proceeds derived from the sale of newspapers" and from the sale of "religious, professional, trade, or sports periodical." Because the tax in Arkansas Writers' Project treated some magazines less favorably than others and made that determination based upon the content of the magazines, the content-based nature of the exemption at issue was of particular note in that case. See id. at 229, 107 S.Ct. 1722 ("this case involves a more disturbing use of selective taxation than Minneapolis Star , because the basis on which Arkansas differentiates between magazines is particularly repugnant to First Amendment principles: a magazine's tax status depends entirely on its content"). As the billboard tax sub judice is not content-based, Arkansas Writers' Project is distinguishable on that account, though it still is instructive in the overall assessment of the billboard tax sub judice.

At the oral argument on the hearing on the Motions for Temporary Restraining Order , counsel for the CITY OF CINCINNATI referenced Ordinance No. 168-2017 and a laundry list of projects contained therein the funding of which was being provided by Ordinance No. 167. Through the testimony of the Cincinnati Budget Director and the explanation of the budgetary process, such projects are those that were advanced at the behest of individual members of the Cincinnati City Council which then caused the previously-balanced budget proposed by the Mayor to run a deficit, necessitating the generation of additional revenues.

The CITY OF CINCINNATI sought to find support for the billboard tax sub judice in court decisions upholding similar billboard taxes adopted in the City of Philadelphia and the City of Baltimore, While the CITY OF CINCINNATI acknowledges that the billboard tax sub judice was developed by merging the billboard taxes from those two cities (utilizing the minimum billboard tax from one city coupled with the tax imposed on gross revenues as imposed by the other city), the court decisions upholding the billboard taxes in those cities do not mandate this Court reach a similar conclusion on the billboard tax sub judice.
In Free Speech, LLC v. City of Philadelphia , 884 A.2d 966 (Pa. Cmwlth. 2005), the court affirmed the denial of a preliminary injunction against Philadelphia's billboard tax; it was not a final dispositive decision on the merits. Furthermore, the bulk of the decision focused on the Equal Protection and Uniformity Clauses of the United States and Pennsylvania Constitutions. See id. at 971-72. And with respect to the First Amendment issue, the Court in Free Speech engaged in minimal substantive analysis, relying, instead, upon its earlier decision in Adams Outdoor Advertising v. Borough of Stroudsburg , 667 A.2d 21 (Pa. Cmwlth. 1995).
While the court in Adams engaged in an analysis of Supreme Court decisions on the subject, specifically mentioning Minneapolis Star and Arkansas Writers' Project , it found its reading of Leathers to be dispositive. However, its analysis of Leathers proceeded from the misleading proposition that "sales tax [in Leathers ] was imposed only upon cable television and no other media." Id. at 26. But as developed supra , the tax in Leathers was "a tax of general applicability" that applied to a broad range of sales (with only certain exemptions), Leathers , 499 U.S. at 447, 111 S.Ct. 1438 ; the tax was not "only upon cable television" as the court in Adams incorrectly characterized it. Furthermore, the court in Adams afforded no significance to earlier Supreme Court decisions, such as Minneapolis Star. Instead of attempting to find the consistencies and distinctions in all decisions by the Supreme Court on taxes implicating the First Amendment, the court in Adams implicitly treated those earlier decisions as effectively overruled by Leathers. But Leathers did not implicitly overrule Grosjean or Minneapolis Star. Thus, this Court finds no support in the analysis in either Free Speech or Adams.
And with respect to the billboard tax in Baltimore, in Clear Channel Outdoor, Inc. v. Department of Finance of Baltimore City , 2018 WL 1178952 (Md. Tax Feb. 27, 2018), the court affirmed the denial of a refund to a billboard company that had paid the tax. While recognizing a constitutional challenge was being made, the court in Clear Channel failed to even consider, let alone analyze, the Supreme Court precedent of Grosjean, Minneapolis Star or Leathers. Thus, it did not apply such precedent in the context of a tax being imposed upon a small group that owns and controls the means or instruments used exclusively for the exercise of First Amendment rights or a tax upon those means or instruments. Instead, the court in Clear Channel minimized any First Amendment interest whatsoever. See id. at *3 ("Petitioner's conduct does not possess 'sufficient communicative elements' for the First Amendment to come.... First Amendment protection extends only to conduct that is inherently expressive and displaying a third party's message on an outdoor advertising billboard in exchange for financial compensation lacks any significant expressive element"). But such a proposition is repudiated by the Supreme Court's decision in Metromedia :
we have never held that one with a "commercial interest" in speech also cannot challenge the facial validity of a statute on the grounds of its substantial infringement of the First Amendment interests of others. Were it otherwise, newspapers, radio stations, movie theaters and producers - often those with the highest interest and the largest stake in a First Amendment controversy - would not be able to challenge government limitations on speech as substantially overbroad.
Metromedia , 453 U.S. at 504 n.11, 101 S.Ct. 2882 ; accord id. at 544, 101 S.Ct. 2882 (Stevens, J., dissenting in part)(billboard owners "have standing to challenge the ordinance because of its impact on their own commercial operations. Because this challenge is predicated in part on the First Amendment...they also have standing to argue that the ordinance is invalid because of its impact on their customers - the persons who use their billboards to communicate with the public"). Thus, the effort of the court in Clear Channel to minimize the First Amendment interests involved and, with it, avoid any substantive analysis of Grosjean and the ensuing cases negates any significance to the decision.

LAMAR and NORTON raise other constitutional challenges to the billboard tax sub judice, viz., a violation of the Equal Protection Clause, see Lamar Complaint ¶¶104-111 & 113-16; Norton Complaint ¶¶ 71-82 ; a violation of the state constitutional requirement of uniformity on the taxation of real property and the improvements thereon, see Lamar Complaint ¶¶ 112-16 ; and, a violation of the dormant Commerce Clause, see Lamar Complaint ¶¶ 133-43 ; Norton Complaint ¶ 83-92. Additionally, LAMAR has sought a writ of mandamus. Lamar Complaint ¶¶ 143-58. In light of the disposition of the Motions for Preliminary Injunction on a different constitutional basis, i.e. , the First Amendment, the Court need not address, at this stage, those other constitutional challenges.

The Sixth Circuit in BellSouth appropriately recognized that in those hybrid situations, i.e. , when the divide between commercial speech and political speech is not readily apparent or ascertainable, the presumption should always be made in favor of finding the speech as being political. To do the opposite, i.e. , make the presumption that such speech is commercial, runs the impermissible risk that some political speech would be afforded less protection as commercial speech. Far better to err in affording speech greater protection to which it might actually be entitled under the First Amendment.

The constitutional validity of a prohibition precluding billboard owners from indicating that the billboard tax "will be absorbed by an advertiser" appears more doubtful, as that statement alone tends to be more political in nature. The increase costs resulting from the billboard tax will be passed along to customers; and in that sense, any indication that the increase costs as a result of the tax is being absorbed by a customer is essentially a true statement that identifies the source of the increased costs, i.e. , the government that imposed the tax.
Similarly, when billboard owners desire to indicate to their customers that the billboard tax will be added to the rent or other charge, they again are stating a substantively accurate fact, i.e. , the increase costs is because of the billboard tax.

"[T]he repeal of a challenged ordinance will moot a plaintiff's request for injunctive relief in the absence of some evidence that the ordinance has been or is reasonably likely to be reenacted." Coral Springs Street Systems, Inc. v. City of Sunrise , 371 F.3d 1320, 1331 n.9 (11th Cir. 2004). While the enactment of Ordinance No. 323 clearly negates the present need for issuance of a preliminary injunction, in light of its passage as an emergency matter with no debate or discussion whatsoever by members of the Cincinnati City Council, whether such passage was simply an interim effort or a more permanent position is not readily apparent. See Federation of Advertising Industry Representatives, Inc. v. City of Chicago , 326 F.3d 924, 930 (7th Cir. 2003) (where there is no reasonable expectation the city will reenact the challenged legislation, the "repeal, expiration, or significant amendment to challenged legislation ends the ongoing controversy and renders moot a plaintiff's request for injunctive relief").
Additionally, "[s]tate courts more typically find it their duty to resolve constitutional questions that federal courts would consider moot, elaborating constitutional norms as 'a matter of public interest'." Helen Hershkoff, State Courts and the "Passive Virtues": Rethinking the Judicial Function , 114 HARv. L. REV. 1833, 1860 (2001). And Ohio courts do apply this principle. See Franchise Developers, Inc. v. City of Cincinnati , 30 Ohio St.3d 28, 31, 505 N.E.2d 966 (1987) ("we believe that although the instant matter is technically moot with respect to the plaintiffs, there still remains a debatable constitutional question for this court to resolve. In addition, we believe that the cause sub judice involves matters of great public interest, thereby vesting this court with jurisdiction to entertain this appeal, even though the controversy is moot with respect to the plaintiffs. Thus, we proceed to resolve this matter under the standard that although a case may be moot with respect to one of the litigants, this court may hear the appeal where there remains a debatable constitutional question to resolve, or where the matter appealed is one of great public or general interest").
However, whether any permanent relief, injunctive or otherwise, on the merits with respect to Ordinance No. 163 is warranted or needed, is not presently before the Court. The Court is simply considering the Motions for Preliminary Injunction and, in light of Ordinance No. 323, the Courts finds preliminary injunctive relief with respect to Chapter 895 of the Cincinnati Municipal Code is not warranted.

Another potential constitutional infirmity within Chapter 313 also arose during the course of the hearing on the Motions for Preliminary Injunction though it is not presently within the pleadings. Cincinnati Municipal Code § 313-15 (e) mandates that the books and records of a billboard owner, i.e. , an "advertising host", or even a person suspected of being one, are subject to warrantless inspections and examinations by officials with the CITY OF CINCINNATI. At a minimum, such provisions appear constitutionally suspect pursuant to City of Los Angeles, Calif. v. Patel , 576 U.S. ----, 135 S.Ct. 2443, 192 L.Ed.2d 435 (2015), and Liberty Coins, LLC v. Goodman , 880 F.3d 274 (6th Cir. 2018).